## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| MAYFAIR WIRELESS LLC, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Civil Action No. 11-772-SLR-SRF |
| | ) |
| CELICO PARTNERSHIP d/b/a VERIZON | ) |
| WIRELESS, AT&T MOBILITY LLC, | ) |
| T-MOBILE USA INC. and | ) |
| SPRINT NEXTEL CORPORATION, | ) |
| | ) |
| Defendants. | ) |

## REPORT AND RECOMMENDATION

### I.    INTRODUCTION

Presently before the court in this patent infringement action are the following motions: (1)

a motion to dismiss the amended complaint for lack of subject matter jurisdiction, filed by

defendants Cellco Partnership (d/b/a Verizon Wireless) ("Cellco"), AT&T Mobility LLC

("AT&T"), T-Mobile USA, Inc. ("T-Mobile"), and Sprint Nextel Corporation ("Sprint")

(collectively, "Defendants") on November 14, 2011 (D.I. 17); and (2) plaintiff Mayfair Wireless,

LLC's ("Mayfair" or "Plaintiff") motion for leave to file a sur-reply in opposition to Defendants'

motion to dismiss (D.I. 30). For the following reasons, I recommend that Defendants' motion be

granted, and that Mayfair's motion be denied as moot.[1]

---

[1] Defendants requested that the court consider all of the briefs submitted with regard to the
Motion to Dismiss, including the respective sur-reply briefs submitted by the parties. All briefs
have been considered by the court for purposes of this Report and Recommendation.

## II.   BACKGROUND

United States Patent No. 6,587,441 ("the '441 patent"), which was published by the

United States Patent and Trademark Office (the "PTO") on July 3, 2003, is directed to a method

and apparatus for data transfer over various wireless networks. ('441 patent, Abstract) The '441

patent claims priority to a provisional application filed on January 2, 1999, which named six

inventors: Jeffrey Urban, Jeffrey Barhorst, Christopher C. Solomon, Herbert Edwards, Chris

Oltrogge, and Adam Albert (collectively, the "Named Inventors"). ('441 patent) The '441 patent

identifies Technology Alternatives, Inc. ("Technology Alternatives") as the assignee. (*Id.*) The

Named Inventors allegedly assigned the '441 patent application to their employer, Gooitech, Inc.

("Gooitech").[2]   (D.I. 19, Exs. D & E) James Solomon acted as CEO of Gooitech. (*Id.*, Ex. G)

Before the application for the '441 patent was filed, Hinsdale Bank & Trust Company

("Hinsdale") extended financing to Gooitech and took a security interest in Gooitech's assets

pursuant to a security agreement dated May 20, 1998. (D.I. 19, Ex. N) The security agreement,

which purportedly covered all existing and after-acquired assets, includes as collateral "general

intangibles" that may be "hereafter acquired," but does not specifically refer to the application for

the '441 patent, which had not yet been filed. (*Id.*) Gooitech subsequently defaulted on its loan,

and the company dissolved.[3]   (*Id.*, Exs. G, O, P) Hinsdale foreclosed on Gooitech's assets,

including the application for the '441 patent. (*Id.*, Ex. G) Hinsdale then purchased Gooitech's

---

[2]Although each of the Named Inventors consistently maintains that they assigned their rights in the '441 patent application to Gooitech, documentation of these assignments is limited to the unconditional written assignments made by Jeffrey Urban and Christopher Solomon to Gooitech in 2001 and 2005, respectively. (D.I. 19, Exs. D & E)

[3]The exact date of Gooitech's dissolution is uncertain due to inconsistencies in the

assets at an Illinois UCC sale. (D.I. 28, Ex. 1)  The August 30, 2000 bill of sale was not recorded

with the PTO and was not produced as an exhibit to the briefing of this motion. (D.I. 19, Ex. C)

Pursuant to a March 31, 2001 bill of sale, Hinsdale sold its rights to the '441 patent

application to Sierra Strategic Consulting, Inc. ("Sierra"). (D.I. 19, Ex. Q)  The March 31, 2001

bill of sale does not reference the application for the '441 patent specifically, but refers generally

to the intellectual property rights that Hinsdale acquired from Gooitech pursuant to the missing

August 30, 2000 bill of sale. (Id.)  On August 10, 2001, Sierra assigned its rights to the

application for the '441 patent to 3P Networks, Inc. ("3P Networks"), which was owned and run

by James Solomon. (Id., Ex. R)

On April 2, 2003, 3P Networks allegedly transferred its rights, title, and interest in the

'441 patent application to Technology Alternatives, Inc. ("Technology Alternatives"), which was

owned by James Solomon and Paul Masanek ("Masanek"). (Id., Ex. S)  James Solomon filed a

document entitled "Notice of Assignment and Assumption of Right" (the "Notice of

Assignment") with the PTO, which acknowledged the transfer from 3P Networks to Technology

Alternatives. (Id.)  The underlying assignment was not filed with the PTO.

The PTO issued the '441 patent on July 1, 2003 to Technology Alternatives as the

assignee. ('441 patent)  After the '441 patent issued, Technology Alternatives entered into a

business relationship with Services by Designwise, Ltd. ("SBD") and TechAlt, Inc. ("TechAlt").

A dispute arose between the entities, and SBD and Masanek sued Technology Alternatives,

TechAlt, and James Solomon. The parties entered into a settlement agreement on November 19,

records of the Illinois Secretary of State.

3

2004, pursuant to which Technology Alternatives became a wholly owned subsidiary of TechAlt. (D.I. 19, Ex. V at § 21.7)

On the same date, TechAlt and SBD entered into a security agreement, in which TechAlt granted SBD a security interest in all of TechAlt's assets, including its purported interest in the '441 patent. (D.I. 19, Ex. T)  SBD prepared a UCC financing statement documenting the security interest and filed it with the PTO.  (*Id.*, Ex. U)

TechAlt subsequently defaulted on its obligations under the security agreement, and SBD filed an action for replevin to foreclose on the collateral.  On September 29, 2005, the parties executed a settlement agreement in which TechAlt and James Solomon allowed SBD to take immediate possession of the collateral described in the November 19, 2004 security agreement. (*Id.*, Ex. W)  The Circuit Court for Cook County, Illinois entered an order of replevin and allowed SBD to take possession of the collateral.  SBD conducted a UCC sale and purchased TechAlt's assets at the sale.  (*Id.*, Ex. CC)

SBD then assigned its purported rights in the '441 patent to Commonwealth Research Group LLC ("CRG") on July 7, 2009.  (*Id.*, Ex. DD)  Pursuant to the assignment agreement, CRG offered to pay SBD $150,000 in exchange for the '441 patent, and promised to pay SBD 40% of any licensing or enforcement revenues from the '441 patent.  (*Id.*, Ex. DD at § 2.2)

The agreement granted CRG a 60-day window to cancel the agreement, which expired without cancellation.  (*Id.*, Ex. DD at §§ 1.2, 1.3)  On November 16, 2010, CRG purported to assign its rights in the '441 patent to Mayfair, effective as of October 20, 2010.  (*Id.*, Ex. EE) The agreement was executed by the same person on behalf of both CRG and Mayfair, and Mayfair agreed to be bound by all of CRG's obligations to SBD.  (*Id.*)

4

Mayfair entered into agreements with the six Named Inventors in the summer of 2011 regarding their assignment of rights in the '441 patent to Mayfair, to the extent that those rights were not previously assigned. (*Id.*, Exs. H-M)  In August 2011, Mayfair also entered into an agreement with Masanek and James Solomon, in which Masanek and James Solomon purported to assign to Mayfair any rights they had acquired in the '441 patent in their capacities as prior owner of SBD, Technology Alternatives, and TechAlt, and prior owner of Gooitech, Sierra, 3P Networks, Technology Alternatives, and TechAlt, respectively. (*Id.*, Exs. FF & GG)  Mayfair initiated the present action on September 1, 2011. (D.I. 1)

## III.   LEGAL STANDARD

Federal Rule of Civil Procedure 12(b)(1) authorizes dismissal of a complaint for lack of jurisdiction over the subject matter, or if the plaintiff lacks standing to bring its claim. Motions brought under Rule 12(b)(1) may present either a facial or factual challenge to the court's subject matter jurisdiction. In reviewing a facial challenge under Rule 12(b)(1), the standards relevant to Rule 12(b)(6) apply. In this regard, the court must accept all factual allegations in the complaint as true, and the court may only consider the complaint and documents referenced in or attached to the complaint. *See Gould Elec., Inc. v. United States*, 220 F.3d 169, 176 (3d Cir. 2000). In reviewing a factual challenge to the court's subject matter jurisdiction, the court is not confined to the allegations in the complaint. *See Mortensen v. First Fed. Sav. & Loan Ass'n*, 549 F.2d 884, 891 (3d Cir. 1977). Instead, the court may consider evidence outside the pleadings, including affidavits, depositions and testimony, to resolve any factual issues bearing on jurisdiction. *Gotha v. United States*, 115 F.3d 176, 179 (3d Cir. 1997). Once the court's subject matter jurisdiction over a complaint is challenged, the plaintiff bears the burden of proving that

5

jurisdiction exists. *See Mortensen*, 549 F.2d at 891.

## IV.    DISCUSSION

### A.    Consideration of Pre-Issuance Gaps in the Chain of Title

In support of their motion to dismiss, Defendants allege three breaks in the chain of title

of the '441 patent. Before reaching the parties' contentions regarding each individual break in

the chain of title, the court will consider Mayfair's contentions that any alleged breaks in the

chain of title occurring prior to the issuance of the '441 patent are irrelevant.

According to Mayfair, the statute conferring the right to sue focuses on the patentee. The

patentee in this case is Technology Alternatives. Mayfair argues that nothing in the statutory

framework allows a challenge to standing based upon alleged deficiencies in the chain of title

prior to the patent's issuance to the patentee. (D.I. 28 at 6-7) Mayfair contends that every

transfer of ownership interest before the '441 patent's issuance to Technology Alternatives

involved an exchange of equitable title, which is irrelevant to a determination of whether breaks

in the legal chain of title occurred. (*Id.* at 7) Mayfair further alleges that Technology

Alternatives, as the named assignee, was the presumptive owner at the time of the '441 patent's

issuance due to the deference given to the PTO's determination of a proper assignment, and

Defendants have failed to overcome the presumption. (*Id.* at 9-10)

In response, Defendants contend that the entire chain of title, including the pre-issuance

chain of title, must be considered because inventorship provides the starting point for

determining the ownership of patent rights. (D.I. 29 at 2-3) Defendants acknowledge that courts

are split regarding whether an assignee listed on the face of a patent is presumptively the owner

of the patent, but they contend that the court need not resolve the split because the undisputed

6

evidence of two pre-issuance breaks in the chain of title rebuts any such presumption. (*Id.* at 3-4)

A patent may issue to either the inventor or an assignee of the patent application. 35 U.S.C. §§ 151, 152. The person or entity to whom the patent is issued is known as the "patentee," and the patentee holds legal title to the patent. 35 U.S.C. § 100(d); *Arachnid, Inc. v. Merit Indus., Inc.*, 939 F.2d 1574, 1578 n.2 (Fed. Cir. 1991) (internal citations omitted). "Patent rights presumptively vest in the named inventors on the patent," or if an assignment has been made, in the named assignee, and the defendant bears the burden of overcoming the presumption to defeat the plaintiff's standing. *Bd. of Trustees of Leland Stanford Junior Univ. v. Roche Molecular Sys., Inc.*, 487 F. Supp. 2d 1099, 1111 n.4 (N.D. Cal. 2007).

"[I]t is settled law that between the time of an invention and the issuance of a patent, rights in an invention may be assigned and legal title to the ensuing patent will pass to the assignee upon grant of the patent." *Filmtec Corp. v. Allied-Signal Inc.*, 939 F.2d 1568, 1572 (Fed. Cir. 1991). If an assignment expressly grants the inventor's rights in any future invention to an assignee, no further act is required once the invention comes into being, and the transfer of legal title to the assignee occurs by operation of law. *Id.* at 1573. An assignment of rights in an invention made prior to the existence of the invention is an assignment of an expectant interest, and the assignee holds equitable title. *Id.* at 1572.

The Manual of Patent Examination Procedure ("MPEP") provides that a patent may issue directly to an assignee if a request for issuance of the application in the name of the assignee is filed with the PTO, indicating that a proper assignment has been recorded with the PTO. MPEP § 307 (citing 37 C.F.R. § 3.81(a)). Although the recording of an assignment with the PTO is not a determination of the validity of the assignment, it creates a presumption of validity. *See* 37

7

C.F.R. § 3.54; *SiRF Tech., Inc. v. Int'l Trade Comm'n*, 601 F.3d 1319, 1327-28 (Fed. Cir. 2010) ("[W]e think that [recording an assignment] creates a presumption of validity as to the assignment and places the burden to rebut such a showing on one challenging the assignment."). This presumption is particularly strong when an assignee seeks to assume responsibility for the prosecution of a patent application before the patent is issued, because the assignee must first establish its ownership rights by providing documentary evidence of the chain of title to the satisfaction of the director of the PTO. 37 C.F.R. § 3.73(b); MPEP § 324.

In the present matter, the patent issued to Technology Alternatives as patentee, giving rise to a presumption that Technology Alternatives properly held legal title at the time the patent issued. To rebut the presumption, Defendants ask the court to examine whether any evidence exists that Technology Associates held legal title to the patent at the time of its issuance. However, no writings exist documenting an assignment to Technology Alternatives. Mayfair contends that deference to the PTO should dispel any challenge to the presumption. However, it would be an exercise in speculation to assume how Technology Alternatives satisfied the PTO of its "ownership interest" without probing the pre-issuance transactions.

Defendants have overcome the presumption by demonstrating a lack of evidence in support of Mayfair's contention that Technology Alternatives is a proper assignee. Specifically, four of the six Named Inventors did not have written assignments on file with the PTO indicating their intention to transfer their ownership interests, in contravention of 35 U.S.C. § 261 and 37 C.F.R. § 3.81(a). The request for issuance of the patent to Technology Alternatives is likewise missing from the PTO's records. Although Mayfair complains that Defendants have produced no documentary evidence to rebut the presumption, the court finds that Defendants have sufficiently

8

argued that the requisite documents do not exist, and Mayfair fails to demonstrate otherwise by producing the required documents demonstrating that the chain of title is intact.

Mayfair relies on *Kahn v. General Motors Corp.* in support of its position that the pre-issuance chain of title is irrelevant to the standing inquiry. However, the district court in *Kahn* acknowledged that the alleged patent owner must be able to establish its ownership rights before it will have the right to sue. 1995 WL 2135, at *1 (S.D.N.Y. Jan. 3, 1993). Although the issuance of the patent-in-suit in the inventor's name was prima facie evidence of the inventor's legal title, the court considered evidence presented by the defendant casting doubt on the inventor's title. *Id.* The court's decision in *Kahn* is distinguishable from the present matter because the court concluded that "it would be unjust to rob the undisputed inventor of the fruits of his prima facie valid patent because a dissolved non-party . . . once had equitable rights in future CIP applications" that the inventor did not file until after the grandparent application had been reassigned to him. *Id.* at *5. In contrast, the instant case does not involve a proper reassignment of the patent-in-suit to the original inventor. For these reasons, the court will assess each alleged break in the chain of title, including those occurring prior to the issuance of the '441 patent.

## B.   Analysis of Three Alleged Gaps in Chain of Title

In support of their motion to dismiss, Defendants contend that three breaks in the chain of title to the '441 patent demonstrate Mayfair's lack of ownership interest in the '441 patent and resulting lack of standing to bring the present action. As the party seeking to invoke the court's subject matter jurisdiction, Mayfair bears the burden of proving that it has standing to sue for infringement. *See Whitmore v. Arkansas*, 495 U.S. 149, 154 (1990); *Sicom Sys., Ltd. v. Agilent*

9

*Techs., Inc.*, 427 F.3d 971, 976 (Fed. Cir. 2005).

## 1.   Bill of sale between Gooitech and Hinsdale

Defendants first contend that the missing August 30, 2000 bill of sale between Gooitech and Hinsdale constitutes a break in the chain of title. (D.I. 18 at 13) According to Defendants, the security agreement entered into by Gooitech and Hinsdale establishes only a lien against "general intangibles" that were owned by Gooitech, without specifically referencing the '441 patent or any intellectual property rights, and the August 30, 2000 bill of sale was not recorded with the PTO. (*Id.*) As a result, Defendants contend that it is impossible to determine whether the missing bill of sale from August 30, 2000 transferred any rights to the '441 patent to Hinsdale. (*Id.* at 14) Defendants further contend that the March 31, 2001 bill of sale from Hinsdale to Sierra, which references the August 30, 2000 bill of sale, does not identify the assignment of rights to the '441 patent specifically. (*Id.* at 14) Defendants allege that the unsigned letter produced by Mayfair announcing the sale, with no description of the collateral, is insufficient to establish the transfer of ownership rights in the '441 patent to Hinsdale. (D.I. 29 at 6-7)

Citing Federal Circuit precedent, Mayfair responds that title to a patent may be transferred without an assignment as a matter of law when a creditor forecloses upon assets pledged by a debtor. (D.I. 28 at 13) According to Mayfair, the evidence establishes that Hinsdale foreclosed on Gooitech's assets pursuant to the terms of the security agreement. (*Id.* at 14) Because the transfer did not require a writing in the first instance, Mayfair contends that it is not required to produce a writing to substantiate the transfer. (*Id.*) Even if the writing requirement were to apply, Mayfair contends that there would be no need to produce the bill of

10

sale because other record evidence is sufficient to establish the bill of sale's existence for

purposes of the standing inquiry. (*Id.* at 15) Mayfair requests further discovery, including

permission to obtain documents from third parties by subpoena, to fully resolve these issues.

(D.I. 28 at 15-16)

As a preliminary matter, Federal Circuit precedent does not support Defendants'

contention that patent rights may only be transferred by an assignment in writing.[4] Although

federal law applies in determining the validity and terms of an assignment, state law controls any

transfer of patent ownership by operation of law not deemed an assignment. *See Sky Techs. LLC*

*v. SAP AG*, 576 F.3d 1374, 1379 (Fed. Cir. 2009) (citing *Akazawa v. Link New Tech. Int'l, Inc.*,

520 F.3d 1354, 1357 (Fed. Cir. 2008)); *Jim Arnold Corp. v. Hydrotech Sys., Inc.*, 109 F.3d 1567,

1572 (Fed. Cir. 1997) ("[T]he question of who owns the patent rights and on what terms typically

is a question exclusively for state courts."). A party that has been granted all substantial rights

under the patent, "regardless of how the parties characterize the transaction that conveyed those

rights," is considered to have legal title, and therefore standing. *Speedplay, Inc. v. Bebop, Inc.*,

---

[4] Defendants' reference to the Supreme Court's 1850 decision in *Gayler v. Wilder*, 51 U.S. 477
(1850), is inapposite. Defendants cite *Gayler* for the general proposition that "no rights can be
acquired in [the patent] unless authorized by statute, and in the manner the statute prescribes."
*Gayler*, 51 U.S. at 494. The Supreme Court addressed the distinction between an assignment of
an undivided interest in a patent, which confers standing to sue for infringement, and a license,
which does not confer standing to sue for infringement. *Id.* at 495. The Supreme Court did not
address a situation involving a foreclosure on a security interest. The Federal Circuit has since
observed that "there exists no federal statute requiring a writing for all conveyances of patent
ownership." *Sky Techs. LLC v. SAP AG*, 576 F.3d 1374, 1381 (Fed. Cir. 2009). Moreover,
Defendants' citation to the Supreme Court's 1881 decision in *Ager v. Murray*, 105 U.S. 126,
131-32 (1881), is unpersuasive in light of the Federal Circuit's decision in *Sky Technologies*,
which noted that the *Ager* decision "was based on the idea that a creditor cannot reach
incorporeal property, such as a patent, due to its intangible nature." *Sky Techs.*, 576 F.3d at 1379.
In distinguishing *Ager*, the Federal Circuit held that "transfer of patent ownership by operation

211 F.3d 1245, 1249-50 (Fed. Cir. 2000). Thus, it is the "substance of what was granted" that determines the rights in the patent, and not the form.[5] *Id.* at 1250.

The evidence in the instant case is insufficient to support Mayfair's contention that Hinsdale properly foreclosed on its interest in Gooitech's property pursuant to the terms of its security agreement. The security agreement granted Hinsdale an interest in all of Gooitech's existing and after-acquired tangible and intangible assets, which encompasses the application that led to the '441 patent. (D.I. 19, Ex. N) The security agreement was subsequently recorded with the PTO. James Solomon, the CEO of Gooitech, filed a statement under 37 C.F.R. § 3.73(b) on August 23, 2001, confirming that Hinsdale took possession of Gooitech's rights pursuant to the security agreement. (D.I. 19, Ex. G)

However, the unsigned notice of public sale issued by Hinsdale on August 9, 2000 fails to list the collateral to be sold, leaving the court to assume that the application leading to the '441 patent was included in the foreclosure sale. (D.I. 28, Ex. 1) Although the August 30, 2000 bill of sale might offer more clarity as to whether the '441 patent application was part of the collateral sold during the foreclosure sale, it is missing, leaving the court to speculate that Hinsdale purchased the '441 patent application at the sale.[6] The subsequent March 31, 2001 bill

---

of law is permissible without a writing." *Id.* at 1380.

[5] Defendants do not contend that Hinsdale failed to comply with the state UCC foreclosure requirements, nor do Defendants contend that a transfer of patent rights by means other than assignment must be made in writing.

[6] This determination is not inconsistent with the court's previous determination that a written assignment is not required to transfer patent rights as a matter of law. In the present case, the record contains a number of writings regarding the transfer of collateral from Gooitech to Hinsdale. In reviewing these writings, the court finds that they do not shed any light on whether the application for the '441 patent was transferred.

of sale between Hinsdale and Sierra describes the property acquired by Hinsdale at the foreclosure sale to generically include "trademarks, patents, [and] patent filings," but does not specify that the '441 patent application was among those intellectual property rights. (D.I. 19, Ex. Q) None of the above-listed evidence identifies the '441 patent application specifically, and as a result, the court declines to assume that the rights to the application for the '441 patent were included in the foreclosure sale.

Mayfair attempts to draw a comparison between the present matter and the Federal Circuit's decision in *Sky Technologies*. In *Sky Technologies*, the Federal Circuit addressed the transfer of title to patent rights pursuant to the terms of a security agreement between Ozro, a corporation with a patent portfolio, and XACP, a venture capital firm. *Sky Techs.*, 576 F.3d at 1376-77. The security agreement granted XACP the right to foreclose on the collateral in the event of a default by Ozro. *Id.* Ozro defaulted, and XACP issued a foreclosure notice identifying the patents-in-suit as those to be sold at a public auction. *Id.* at 1377. XACP then credit bid at the auction to buy the patents. *Id.* at 1378. The Federal Circuit concluded that XACP properly complied with the Massachusetts UCC foreclosure requirements by placing the patent collateral up for sale at a public auction and notifying Ozro of the sale. *Id.* at 1380-81. When XACP later assigned the patents-in-suit to Sky Technologies, the Federal Circuit concluded that Sky Technologies became vested with all rights, title and interest in the patents because the chain of title had not been broken. *Id.* at 1381.

*Sky Technologies* is distinguishable from the facts of the present matter. First, in *Sky Technologies*, the notice of sale specifically listed the patents-in-suit as those that were for sale. *Id.* at 1380. In contrast, the notice of sale in the instant action does not list the collateral at all.

13

Instead, the notice of sale says, "The Collateral to be sold is described as follows:" with no

subsequent description. (D.I. 28, Ex. 1)  Second, the Federal Circuit in *Sky Technologies* based

its ruling on the fact that all of the requirements of the Massachusetts UCC had been met. *Sky*

*Techs.*, 576 F.3d at 1380.  In the present matter, there is no evidence that the sale complied with

the Illinois UCC.

For these reasons, I recommend that the court find a break in the chain of title between

Gooitech and Hinsdale.  However, even if it is assumed that legal title to the '441 patent

application passed from Gooitech to Hinsdale by virtue of the Illinois UCC sale, the court is

asked to address two other potential breaks in the chain of title.

### 2.    Notice of assignment from 3P Networks

Defendants contend that a second break in the chain of title occurred between 3P

Networks and Technology Alternatives because no written assignment regarding the transfer is

on file with the PTO, and the notice of assignment between them is not an acceptable substitute

for a written assignment.  (D.I. 18 at 14)  According to Defendants, the notice of assignment

suggests that ownership of the '441 patent was transferred to Technology Alternatives in the past,

but it conveys no rights standing alone.  (*Id.*)  Defendants note that oral assignments are

insufficient to transfer patent rights under 35 U.S.C. § 261, and observe that the case law cited by

Mayfair in support of its position does not involve an oral assignment.  (D.I. 29 at 7)

In response, Mayfair contends that the notice of assignment was sufficient to transfer title

to the patent because a valid assignment requires only a writing that unmistakably demonstrates

the parties' intent to transfer title to the patent.  (D.I. 28 at 16)  Mayfair alleges that the PTO

would not allow Technology Alternatives to prosecute the application and would not issue the

14

patent to Technology Alternatives without first determining that the documents on file with the
PTO were sufficient to demonstrate a proper assignment to Technology Alternatives. (*Id.* at 16-
17) According to Mayfair, even assuming that the prior transfer from 3P Networks to
Technology Alternatives was an oral transfer, the notice of assignment is a writing that expresses
the parties' unmistakable intent to transfer title to the patent application. (*Id.* at 18)

To the extent that an oral assignment of the rights to the '441 patent was made, the
assignment between 3P Networks and Technology Alternatives fails because only written patent
assignments which are recorded with the PTO are valid. 35 U.S.C. § 261. However, the notice
of assignment between 3P Networks and Technology Alternatives sufficiently sets forth an intent
to transfer ownership rights in the '441 patent to qualify as an assignment for purposes of 35
U.S.C. § 261. Although the notice of assignment is not identified as an "assignment," courts
have held that the inquiry turns on the intent to transfer ownership rights in the patent, and not
the title of the document. *See McClaskey v. Harbison-Walker Refractories Co.*, 138 F.2d 493,
499 (3d Cir. 1943) (holding that a bill of sale executed by the sheriff constituted an assignment
because it sufficiently showed "an unmistakable intention to convey to the plaintiff everything
which the sheriff had to sell."); *Valmet Paper Machinery, Inc. v. Beloit Corp.*, 868 F. Supp.
1085, 1087 (W.D. Wis. 1994) (concluding that written agreement demonstrated parties' intention
to transfer all rights to the patent-in-suit, "[e]ven though it purports merely to confirm the
ineffective prior oral agreement."). In the present matter, the notice of assignment lists the patent
application for the '441 patent and specifically states that,

> [O]wnership in the same was transferred to Technology Alternatives, Inc. . . . This
> includes the entire right, title and interest in the Pending Patent Application and in
> and to all Letters Patent, of the United States and foreign countries, including any

15

divisionals, continuations, reissues and extensions thereof, that may be obtained
therefor.

(D.I. 19, Ex. S) In keeping with the *McClaskey* court's decision, the notice of assignment in the

present matter sufficiently reflects 3P Networks' intent to assign ownership of the application for

the '441 patent to Technology Alternatives. *McClaskey*, 138 F.2d at 500 ("We think that to

effect the assignment of a patent it is not necessary to observe a precise formula so long as what

is done meets the substance of the requirements of the federal statute.").

The facts of the present case are distinguishable from the facts set forth in the cases cited

by Defendants. Specifically, in *Wheat v. Morrell*, the patent issued prior to the purported

assignment, and recording the purported assignment with the PTO did not result in a

determination by the PTO of the validity of the assignment or the effect it might have on the title

to a patent application. *Wheat v. Morrell*, 2010 WL 3522803, at *6 (W.D. Mo. Sept. 2, 2010); 37

C.F.R. §§ 3.54, 3.73(b). When the situation before the court does not involve an assignee who

will take over the prosecution of a patent application, but instead involves the assignment of an

issued patent to an assignee as in *Wheat*, "[t]he recording of a document . . . is not a

determination by the [PTO] of the validity of the document or the effect that document has on the

title to an application, a patent, or a registration." 37 C.F.R. § 3.54.

Defendants also cite *Sentinel Products Corp. v. Mobile Chemical Co.*, in which the

District of Massachusetts concluded that a bill of sale could not be read as an assignment of all

rights in the patent because the bill of sale did not include the patent in the list of property to be

transferred, "nor anything even resembling the patents." 2001 WL 92272, at *7 (D. Mass. Jan.

17, 2001). The court finds that *Sentinel Products* is distinguishable because the notice of

16

assignment in the present matter expressly lists the patent-in-suit, indicating the intent to transfer ownership rights in the patent.

In their reply brief, Defendants emphasize the use of the past tense in the notice of assignment as an indication that no transfer of patent rights was intended by that document. (D.I. 29 at 7-8)  Defendants' position is inconsistent with the Western District of Wisconsin's decision in *Valmet Paper*, in which the court expressly indicated that the agreement satisfied the requirements for an assignment by purporting to "confirm the ineffective prior oral agreement." *Valmet Paper*, 868 F. Supp. at 1087.

Therefore, assuming that the first break in the chain of title had not occurred, I recommend that the court find legal title effectively transferred to Technology Alternatives through the Notice of Assignment recorded by 3P Networks.

### 3.   Assignment from Technology Alternatives to TechAlt

Defendants contend that the absence of an assignment from Technology Alternatives to TechAlt creates a third break in the chain of title, citing Federal Circuit precedent for the proposition that a written assignment is necessary to transfer legal title even between a parent and its subsidiary. (D.I. 18 at 15-16)  According to Defendants, any indirect conveyance of the '441 patent to SBD that occurred under Illinois law is inconsistent with, and is preempted by, the Patent Act. (D.I. 29 at 9)  Moreover, Defendants contend that no provision of the underlying security agreement indicates that shares of TechAlt were posted as collateral, and Mayfair's presumption that SBD acquired all of TechAlt's assets is insufficient in light of unrefuted evidence that another entity claims to have acquired TechAlt's assets. (*Id.* at 10)

In response, Mayfair alleges that SBD took title to the '441 patent directly from

17

Technology Alternatives as a matter of law under the UCC provisions by way of a security agreement executed by TechAlt on November 19, 2004 and a settlement agreement executed by Technology Alternatives on the same date. (D.I. 28 at 18) Mayfair contends that TechAlt specifically pledged the '441 patent as part of the security agreement, and this pledge was proper despite the fact that TechAlt did not hold title to the '441 patent because Technology Alternatives consented to TechAlt's pledge in the settlement agreement entered into by the parties on the same date. (*Id.*) Mayfair further argues that, even if TechAlt did not have the right to pledge the '441 patent, the UCC sale resulted in an indirect transfer of the '441 patent to SBD, curing any defect. (*Id.* at 20) Mayfair alleges that SBD became the sole owner of Technology Alternatives, and Technology Alternatives' rights in the '441 patent, as a result of the UCC sale. (*Id.*)

The parties agree that Technology Alternatives did not assign its ownership interest in the '441 patent to TechAlt in writing, and that TechAlt did not have legal title to the '441 patent. Instead, the issues before the court are whether Technology Alternatives consented to TechAlt's pledge of the '441 patent to SBD as collateral in the November 19, 2004 security agreement, whether such consent is valid, and whether an indirect transfer of the '441 patent to SBD would cure any defect.

Illinois law provides that a debtor may have sufficient rights to pledge collateral belonging to another "if the true owner of the collateral has agreed to the debtor's use of the collateral as security." *Matter of Pubs, Inc. of Champaign*, 618 F.2d 432, 436 (7th Cir. 1980). Mayfair contends that Technology Alternatives consented to TechAlt's pledge of the '441 patent by executing the November 19, 2004 settlement agreement, which incorporated by its terms "[a]ll the terms and conditions of the Related Agreements," including the November 19, 2004

18

security agreement between TechAlt and SBD. (D.I. 19, Ex. V at ¶¶ 1.b, 21.7) In the security agreement, TechAlt pledged collateral, defined as "[a]ll of [TechAlt's] . . . patents, licenses, including patent licenses, including the intellectual property set forth on Exhibit A . . ." (*Id.*, Ex. T at 1) Exhibit A to the security agreement includes the following language:

> 3. TECHALT PATENT – US Patent Number 6,587,441 B1, issued July 1, 2003, and associated applications for transmission (i.e. images, audio, documents, etc.), storage, retrieval, viewing and output of customer data (the "IP").

(*Id.*, Ex. T at 15) The security agreement states that TechAlt "has, or will have upon the occurrence of the Merger[7] as defined in the Note, full title to the COLLATERAL." (*Id.*, Ex. T at 2)

Even if the court were to assume that state law permits Technology Alternatives to consent to TechAlt's inclusion of the '441 patent as security, the Illinois UCC provisions are preempted by § 261 of the Patent Act because Technology Alternatives and TechAlt never executed a written assignment. "Conflict preemption occurs when state law 'stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.'" *Ultra Precision Mfg. Ltd. v. Ford Motor Co.*, 411 F.3d 1369, 1377 (Fed. Cir. 2005) (quoting *Aronson v. Quick Point Pencil Co.*, 440 U.S. 257, 262 (1979)). The writing requirement imposed by 35 U.S.C. § 261 fulfills the policy of "surround[ing] the conveyance of patent property with safeguards resembling those usually attaching to that of land." *Westinghouse Elec. & Mfg. Co. v. Formica Insulation Co.*, 266 U.S. 342, 349 (1924). "[P]reemption is justified . . .

---

[7] Pursuant to the terms of the November 19, 2004 settlement agreement, Technology Alternatives became a wholly-owned subsidiary of TechAlt, and all of the shares of common stock of Technology Alternatives were exchanged for shares of common stock of TechAlt, but Technology Alternatives and TechAlt remained separate legal entities. (D.I. 19, Ex. V at ¶¶ 2.1,

to the extent that state law conflicts significantly with the writing requirement, or some other federal policy or interest." *Abraxis Bioscience, Inc. v. Navinta LLC*, 672 F.3d 1239, 1243 n.2 (Fed. Cir. 2011) (internal citations omitted).

In light of the foregoing authority, the court cannot overlook the absence of a written assignment between Technology Alternatives and TechAlt. The Federal Circuit has rejected the notion that common corporate structure can be used to overcome the writing requirement, holding that "even between a parent and a subsidiary, an appropriate written assignment is necessary to transfer legal title from one to the other." *Abraxis Bioscience, Inc. v. Navinta LLC*, 625 F.3d 1359, 1366 (Fed. Cir. 2010) (internal citations omitted). Thus, TechAlt could not confer an interest in the '441 patent to SBD because it did not possess legal title to the patent, and recognition of an indirect transfer between Technology Alternatives and SBD would thwart the congressional objective of requiring a writing to transfer ownership of patent rights.[8]

Unlike the circumstances of the first break in the chain of title, *see* § IV.B.1, *supra*, the relationship between Technology Alternatives and TechAlt is not one of a creditor foreclosing on assets pledged by a debtor. The proper mechanism to transfer legal title to the § 441 patent to TechAlt was by way of written assignment, but Technology Alternatives and TechAlt never exchanged legal title. Technology Alternatives' alleged indirect transfer to SBD by operation of consent is preempted by the Patent Act for the reasons previously stated.

---

2.2, 2.3)

[8] Moreover, Mayfair's contention that the UCC sale resulted in an indirect transfer of the '441 patent from Technology Alternatives to SBD is based on a presumption that SBD acquired all of TechAlt's assets. However, Defendants have produced evidence that another entity acquired TechAlt's assets in October 2005, including rights under a contract between IBM and Technology Alternatives. (D.I. 29, Ex. 2 at ¶ 9) This evidence suggests that the October 31,

The Seventh Circuit's decision in *Matter of Pubs, Inc. of Champaign* is distinguishable because it addresses an estoppel argument.[9] 618 F.2d 432, 436 (7th Cir. 1980). Application of the holding in *Matter of Pubs* to the present case suggests that Technology Alternatives is estopped from objecting to SBD's security interest in the patent. It is not a doctrine that substitutes for actual transfer of legal title.[10] Even if the court were to find that estoppel equates to an actual transfer of legal title, it is unclear who purchased the '441 patent in the foreclosure sale. *See* § IV.B.3, n.8, *supra*. For the foregoing reasons, I recommend that the court grant Defendants' motion to dismiss.

## C.   Bona Fide Purchaser

Mayfair contends that any defects in the chain of title are irrelevant to CRG, a bona fide purchaser that paid valuable consideration to acquire the '441 patent and was not aware of any defects in the chain of title until after it purchased the '441 patent. (D.I. 28 at 12) According to Mayfair, the documents in the PTO's files indicate that the rights to the patent application were transferred along the chain of title that led to CRG, and the PTO concluded that those documents were sufficient to issue the patent to Technology Alternatives. (*Id.* at 13)

Defendants reply that a bona fide purchaser must take its title from an entity that actually

---

2005 UCC sale did not result in a transfer of all of TechAlt's assets to SBD.

[9] In *Matter of Pubs*, Pubs was the owner of the property in issue, having taken title pursuant to a bill of sale which recited a security interest in the property. However, the security interest was executed **after** title transferred to Pubs. The court ruled that Pubs was therefore estopped to deny the validity of the creditor's security interest since Pubs knew of the transaction, which was completed by the current officers / directors of Pubs, when they no longer possessed legal title to the property. *Matter of Pubs, Inc. of Champaign*, 618 F.2d 432 (7th Cir. 1980).

[10] James Solomon maintained ownership and/or management positions in Gooitech, 3P Networks, Sierra, Technology Alternatives, and TechAlt. These positions caused him to appear on both sides of several transactions regarding the attempted transfers of ownership rights to the '441 patent.

21

held legal title, and the fatal breaks in the '441 patent's chain of title leading up to SBD's alleged ownership preclude SBD from being considered a bona fide purchaser. (D.I. 29 at 4-5) Moreover, Defendants contend that CRG and Mayfair are not bona fide purchasers because they had actual, constructive or inquiry notice of defects which were readily apparent from the PTO records. (*Id.* at 5)

A bona fide purchaser is "one who purchases legal title to property in good faith for valuable consideration, without notice of any other claim of interest in the property." *Bd. of Trustees of Leland Stanford Junior Univ. v. Roche Molecular Sys., Inc.*, 583 F.3d 832, 843 (Fed. Cir. 2009); *see also Rhone Poulenc Agro, S.A. v. DeKalb Genetics Corp.*, 284 F.3d 1323, 1329 (Fed. Cir. 2002). "It is well established that when a legal title holder of a patent transfers his or her title to a third party purchaser for value without notice of an outstanding equitable claim or title, the purchaser takes the entire ownership of the patent, free of any prior equitable encumbrance." *Filmtec Corp. v. Allied-Signal Inc.*, 939 F.2d 1568, 1573 (Fed. Cir. 1991). However, a purchaser from a seller who does not have legal title cannot assert the protection of the bona fide purchaser rule. *Rhone Poulenc*, 284 F.3d at 1329 (citing *Cook v. Eller*, 298 S.C. 395, 380 S.E.2d 853, 854 (1989) ("An individual cannot claim bona fide purchaser status if his grantor never had title to the property.")).

In the present matter, Mayfair is not a bona fide purchaser because Mayfair did not take its title from an entity that held legal title to the '441 patent. *See Filmtec Corp.*, 939 F.2d at 1573. As previously discussed, the break in the chain of title between Technology Alternatives and TechAlt prevented SBD from obtaining legal title to the '441 patent. *See* IV.B.3, *supra*. Therefore, SBD had no legal title to transfer or assign to CRG, and CRG had no legal title to

22

transfer or assign to Mayfair.

Moreover, Mayfair cannot be a bona fide purchaser for value because it had at least constructive or inquiry notice of defects in the chain of title to the '441 patent. The Patent Assignment Agreement between SBD and CRG provided CRG with a sixty day cancellation period during which CRG could cancel the agreement upon determining that the patents were not acceptable. (D.I. 19, Ex. DD) The publicly available records from the PTO reflected six original inventors, but only two assignments from the inventors were recorded. (*Id.*, Exs. D & E) CRG's failure to investigate the '441 patent's chain of title during the sixty day cancellation period precludes an application of the *bona fide* purchaser rule in the present matter. *See Leland Stanford Junior Univ.*, 583 F.3d at 843 ("'Notice' under § 261 can include constructive or inquiry notice, in addition to actual notice.").

## V. CONCLUSION

For the foregoing reasons, I recommend that the court grant Defendants' motion to dismiss for lack of subject matter jurisdiction (D.I. 17), and deny as moot Mayfair's motion for leave to file a sur-reply brief (D.I. 30).

This Report and Recommendation is filed pursuant to 28 U.S.C. § 636(b)(1)(B), Fed. R. Civ. P. 72(b)(1), and D. Del. LR 72.1. The parties may serve and file specific written objections within fourteen (14) days after being served with a copy of this Report and Recommendation. Fed. R. Civ. P. 72(b). The objections and responses to the objections are limited to ten (10) pages each. The failure of a party to object to legal conclusions may result in the loss of the right to de novo review in the District Court. *See Sincavage v. Barnhart*, 171 F. App'x 924, 925 n.1 (3d Cir. 2006); *Henderson v. Carlson*, 812 F.2d 874, 878-79 (3d Cir. 1987).

23

The parties are directed to the court's standing Order in Non Pro Se matters for

Objections filed under Fed. R. Civ. P. 72, dated November 16, 2009, a copy of which is available

on the court's website, www.ded.uscourts.gov.

Dated: August 30, 2013

Sherry R. Fallon
UNITED STATES MAGISTRATE JUDGE

24